**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

| | |
|---|---|
| **DAVID J. BESCHAUER** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Case No.** \_\_7:18CV105_____ |
| | ) |
| **Nena M. Adams,** | ) |
| | ) |
| **Clyde R. Alderman,** | ) |
| | ) |
| **Teddy L. Batton,** | ) |
| | ) |
| **Shakita N. Bland,** | ) |
| | ) |
| **Lionel L. Blankenship,** | ) |
| | ) |
| **David R. Boehm,** | ) |
| | ) |
| **Dallas D. Bradshaw,** | ) |
| | ) |
| **Officer Burnette,** | ) |
| | ) |
| **Leon J. Churchwell,** | ) |
| | ) |
| **Gregory D. Davis,** | ) |
| | ) |
| **Liwana L. Davis,** | ) |
| | ) |
| **David N. Dillow,** | ) |
| | ) |
| **William S. Irwin,** | ) |
| | ) |
| **Valerie C. Laney,** | ) |
| | ) |
| **Jason W. McCrosky,** | ) |
| | ) |
| **Michael F. Murphy,** | ) |
| | ) |
| **Donald R. Nelson,** | ) |
| | ) |
| **Tonny J. Parker,** | ) |

|                                                    |     |
|----------------------------------------------------|-----|
| **Holly A. Pauley,**                               | )   |
|                                                    | )   |
| **Eric Powers,**                                   | )   |
|                                                    | )   |
| **Larry W. Shelton,**                              | )   |
|                                                    | )   |
| **Jasmine Steptoe,**                               | )   |
|                                                    | )   |
| **and**                                            | )   |
|                                                    | )   |
| **Richard P. Tolliver**                            | )   |
|                                                    | )   |
| **Serve:  ALL DEFENDANTS**                         | )   |
| **Bland Correctional Center**                      | )   |
| **256 Bland Farm Road**                            | )   |
| **Bland, Virginia 24315**                          | )   |
|                                                    | )   |
| **Defendants.**                                    | )   |
|                                                    | )   |

## COMPLAINT

Plaintiff David J. Beschauer ("Mr. Beschauer") hereby files his Complaint seeking judgment against Defendants and alleges as follows:

## JURISDICTION AND VENUE

1.     This Court is vested with federal question jurisdiction to adjudicate Mr. Beschauer's Section 1983 claim by virtue of 28 U.S.C. §§ 1331 and 1343(A).

2.     Venue is proper pursuant to 28 U.S.C. § 1391(B) because a substantial part of the acts and omissions giving rise to Mr. Beschauer's claims occurred in the Western District of Virginia.

3.     Assignment to the Roanoke Division of the Western District of Virginia is proper pursuant to Western District of Virginia Local Rules 1 and 2 because a substantial part of the acts and omissions giving rise to Mr. Beschauer's claims occurred in Bland County.

2

## PARTIES

4.      Mr. Beschauer is an individual residing in the county of Radford, Virginia.

5.      The individual Defendants are employees of the Virginia Department of Corrections who at all times relevant to this action were employed at Bland Correctional Center located at 256 Bland Farm Road, Bland, Virginia 24315.

## STATEMENT OF FACTS

6.      During the period of time relevant to this action, Mr. Beschauer was a 68 year-old man incarcerated at the BCC.

7.      Prior to the events alleged herein, Mr. Beschauer had been diagnosed with Parkinson's disease and in fact was receiving treatment for the same at BCC.

8.      On or about February 11, 2016, Mr. Beschauer had an office conference with Ms. Adams to discuss a previously filed grievance.

9.      While in the midst of the conversation with Defendant Nena Adams ("Ms. Adams"), Mr. Beschauer revealed to Ms. Adams that offenders in his unit were engaging in unauthorized activities such as selling contraband, roaming freely in their tiers without supervision, and brawling without consequence.

10.      Ms. Adams had been an employee of VDOC for several years prior to this point in time and recognized that the information revealed by Mr. Beschauer presented security concerns and that Mr. Beschauer's decision to report misconduct on the part of his fellow inmates put his physical safety at risk in that inmates who "snitch" were exceedingly likely to be assaulted by offenders residing in the same housing unit.  Ms. Adams further recognized that this risk of harm was particularly elevated as to Mr. Beschauer because his age and preexisting medical conditions limited his ability to defend himself in the event of an attack.

3

11.     Ms. Adams asked if Mr. Beschauer would repeat the information he had provided to Lt. Liwana Davis ("Lt. Davis") given Lt. Davis was charged with overseeing the security of the offenders in Mr. Beschauer's housing unit (Buiding 3).

12.     Mr. Beschauer agreed to Ms. Adams' request and, accordingly, Ms. Adams summoned Lt. Davis to her (Ms. Adams') office.

13.     When asked by Ms. Adams to repeat to Lt. Davis the information he had just provided to Ms. Adams, Mr. Beschauer agreed to do so with the assurance that he could be removed from his current housing unit and placed into protective custody if things became intolerable as a result of inmate hostility.

14.     Ms. Adams and Lt. Davis responded by assuring Mr. Beschauer that he would be removed from Building 3 if he experienced aggressive behavior from other inmates.  Ms. Adams and Lt. Davis further remarked that, regardless, Mr. Beschauer would be removed from Building 3 in a few days' time, but not immediately, so as to avoid attracting unwanted attention from other offenders.

15.     Ms. Adams and Lt. Davis made this commitment to Mr. Beschauer because they fully understood from their prior experience in correctional work that Mr. Beschauer "snitching" in the manner requested would put him at serious risk of being harmed by fellow offenders should he be suspected of being the informant.  They further knew from prior experience that the risk of Mr. Beschauer suffering severe physical harm (even to the point of death) from such an assault was particularly elevated in Mr. Beschauer's case given his age and preexisting medical conditions limited his ability to defend himself in the event of an assault.

16.     In fact, Ms. Adams and Lt. Davis expressly acknowledged during their meeting with Mr. Beschauer that he could not be protected from assault so long as he resided in his

4

current housing unit.

17.    Relying on Defendants Adams' and Davis' representation that he would be moved from his housing unit upon observing aggressive behavior from other offenders and, in any event, after "a few days" at most, Mr. Beschauer then told Lt. Davis that inmates in his housing area were engaged in unauthorized activity such as selling contraband, roaming freely in their tiers without supervision, and brawling without consequence.  He further reported that correctional officers assigned to the housing unit were complicit in observed offender misconduct by ignoring blatant violations of institutional policy and engaging in conduct such as "flickering" the unit lights when supervisory officers were en route so inmates would have sufficient forewarning to conceal their unauthorized conduct.

18.    Ms. Adams and Lt. Davis encouraged Mr. Beschauer to continue providing intelligence of this nature by making anonymous written statements on unsigned pieces of paper and placing the same in her mailbox located in the yard (i.e., a location in which Mr. Beschauer could be observed by other offenders).  Ms. Adams assured Mr. Beschauer that she would deliver all such reports to Lt. Davis.

19.    Ms. Adams and Lt. Davis directed Mr. Beschauer to submit his written reports in anonymous format because they understood that Mr. Beschauer's life would be in danger if other offenders in his housing unit were to find out that he was making such reports (either by seeing a copy of the report or through Ms. Beschauer's identity being leaked by derelict correctional officers reprimanded as a result of the same).  Relying on Defendants' representation that he would be moved from his housing unit upon observing aggressive behavior from other offenders and, in any event, after "a few days" at most, Mr. Beschauer agreed to provide Ms. Adams and Lt. Davis intelligence as requested.

20.     Shortly after the meeting with Mr. Beschauer on February 11, 2016, Lt. Davis contacted Sergeant David Dillow ("Sgt. Dillow") in the investigations unit.  Lt. Davis informed Sgt. Dillow that Mr. Beschauer had provided her certain information regarding inmate and officer misconduct (as previously specified above).

21.     On February 12, 2016, Lt. Davis met with Major Teddy Batton ("Major Batton") and Captain Larry W. Shelton ("Captain Shelton") in the watch office.  Lt. Davis informed Major Batton and Captain Shelton that Mr. Beschauer had provided her certain information regarding inmate and officer misconduct (as previously specified above).  Major Batton ordered Lt. Davis to perform an investigation of Mr. Beschauer's allegations and report her findings.

22.     On February 12, 2016, Mr. Beschauer placed an anonymous report in Ms. Adams' mailbox (the "February 12 Report").

23.     Ms. Adams received the February 12 Report, read it, and personally delivered it to Lt. Davis.  Although the exact date that Ms. Adams delivered the February 12 Report to Lt. Davis is not known, it is known that it occurred no later than March 1, 2016.

24.     On February 21, 2016, Mr. Beschauer placed an anonymous report in Ms. Adams' mailbox (the "February 21 Report").

25.     Ms. Adams received the February 21 Report, read it, and personally delivered it to Lt. Davis.  Although the exact date that Ms. Adams delivered the February 21 Report to Lt. Davis is not known, it is known that it occurred no later than March 1, 2016.

26.     Prior to March 1, 2016, Ms. Davis discussed the information contained in the February 12 Report and February 21 Report with Captain Nelson.

27.     On March 1, 2016, Lt. Davis dictated a memorandum to Warden Boehm which was typed by Sgt. Dillow.  This memorandum detailed the prior intelligence provided by Mr.

Beschauer and contained Lt. Davis's conclusion from her investigation that officers had been complicit in inmate misconduct by flickering lights to warn inmates of approaching supervisors.

28.     On March 4, 2016, Lt. Davis and Unit Manager Michael F. Murphy discussed the matter with one of the officers complicit in inmate misconduct—an officer named Officer Burnette.  During the meeting, Lt. Davis informed Officer Burnette that she had received several complaints about his actions.   Officer Burnette responded by stating his belief that Mr. Beschauer was the inmate who had complained against him.

29.     Defendants understood by virtue of their years of prior correctional experience that Mr. Beschauer was placing himself at substantial risk of violent physical assault from other inmates by revealing the information contained in his reports if he were not relocated promptly. They further knew from prior experience that the risk of Mr. Beschauer suffering severe physical harm (even to the point of death) from such an assault was particularly elevated as to Mr. Beschauer given: (a) he could be observed by other offenders placing such reports in Ms. Adams' mailbox; and (b) Mr. Beschauer's age and preexisting medical conditions limited his ability to defend himself in the event of an assault.

30.     Throughout February and into early March, inmates in Mr. Beschauer's housing unit demonstrated increasingly aggressive language and behavior towards him because they suspected that Mr. Beschauer had been informing BCC supervisors about offender misconduct in his housing unit and/or the complicity of various correctional officers in such conduct.  Fearful for his life, Mr. Beschauer wrote a letter directly to Lt. Davis alerting her that he was being threatened and that he needed to be moved for his own safety.

31.     Despite receiving this letter, reading it, and understanding that Mr. Beschauer faced a substantial risk of being assaulted by other inmates and suffering severe physical injury

(even to the point of death) if he was not relocated promptly, Lt. Davis took no action in response to the letter.

32. Mr. Beschauer made his final anonymous report to Ms. Adams on or about March 8, 2016. In that report, Mr. Beschauer reported that it was widely known in his housing unit that he had snitched on a correctional officer who had been complicit in offender unauthorized conduct and, as a result, that officer had been replaced. He again requested a change in housing.

33. Ms. Adams read this report and forwarded it to Lt. Davis, who also read it. Both Ms. Adams and Lt. Davis understood based on their prior experience as correctional professionals that Mr. Beschauer was at imminent risk of suffering a violent physical assault at the hands of other offenders in his housing unit because Mr. Beschauer was now known to be a "snitch." They further knew from prior experience that the risk of Mr. Beschauer suffering severe physical harm (even to the point of death) from such an assault was particularly elevated given Mr. Beschauer's age and preexisting medical conditions limited his ability to defend himself in the event of an assault.

34. At all times after Mr. Beschauer first reported the unauthorized conduct occurring in his housing unit to Ms. Adams and Lt. Davis (and, particularly, in each instance he sent written correspondence requesting a housing change due to him developing enemies in his housing unit secondary to his provision of intelligence to Ms. Adams and Lt. Davis), Ms. Adams and Lt. Davis were required under VDOC policy to report the situation to their officer-in-charge ("OIC") and other members of the chain of command so that Mr. Beschauer's housing assignment could be adjusted immediately to ensure his physical safety. This reporting obligation was non-discretionary in nature and a routine duty associated with their position.

35. By enlisting Mr. Beschauer to provide intelligence as to offender/correctional

officer misconduct and then not taking measures necessary to timely relocate Mr. Beschauer, Ms. Adams and Lt. Davis actually increased the likelihood that Mr. Beschauer would be the victim of a violent assault by other offenders and suffer severe bodily injury (even possibly to the point of death).

36.    On March 6, 2016, Captain Nelson emailed a Shift Report to the entire evening shift. In that email he passed along a drop note from another inmate in Mr. Beschauer's housing unit regarding the fact that Beschauer was in imminent danger of bodily harm. "Drop note received – Stating that Beschauer #1137726 needed to be moved from 3-N before he was beaten because he threaten[sic] to tell on 4 offenders."

37.    On March 10, 2016, Mr. Beschauer entered the day room of his housing unit and sat down. Joshua Andrew Crowder, an inmate also residing in Building 3, viciously attacked Mr. Beschauer because he believed Mr. Beschauer had snitched on his friend. Mr. Crowder repeatedly punched Mr. Beschauer in the face until Mr. Beschauer's skull fractured and his face caved in.

38.    As a direct result of the assault by Mr. Crowder, Mr. Beschauer required emergent medical care at Lewis-Gale Medical Center for two orbital fractures and bruised and/or broken ribs. The trauma Mr. Beschauer experienced during the assault and recovery period thereafter caused him extreme physical pain, emotional distress, and continuing sequelae such as permanent hearing loss, residual brain trauma, and psychological injury.

### Count I – Section 1983 Eighth Amendment Violation
### (All Defendants)

39.    Mr. Beschauer incorporates the prior allegations of this pleading as if fully stated within this Count.

40.    As established by the factual allegations incorporated into this Count, Ms. Adams

9

and Lt. Davis were aware at all times spanning February 1, 2016 – March 10, 2016 that Mr. Beschauer's repeated acts of divulging unauthorized inmate conduct and various correctional officers' complicity with the same put him at imminent risk of suffering a violent physical assault at the hands of other offenders in his housing unit.  All defendants knew as of March 6th that Beschauer was in imminent danger of bodily harm.  They further knew from prior experience that the risk of Mr. Beschauer suffering severe physical harm (even to the point of death) from such an assault was particularly elevated as to Mr. Beschauer given: (a) Mr. Beschauer had been directed to submit his reports in a manner that could be viewed by other offenders in his housing unit; and (b) Mr. Beschauer's age and preexisting medical conditions limited his ability to defend himself in the event of an assault.

41.     Defendants' awareness of the risk of harm Mr. Beschauer faced was manifest in their early promise to move Mr. Beschauer to a new housing unit should he observe aggressive behavior from other offenders in his housing unit and, in any event, after "a few days" at most and their instructions to Mr. Beschauer to provide the requested intelligence via anonymous written communication.  Furthermore, Defendants were well aware of the propensity of inmates to brutally assault other inmates suspected or reputed to be "snitches."

42.     Defendants exhibited deliberate indifference to the known and substantial risk that Mr. Beschauer would suffer a violent assault at the hands of other offenders in his housing unit by:

a.  Failing to abide by their representation that they would relocate Mr. Beschauer to a new housing unit should he observe aggressive behavior from other offenders in his housing unit and, in any event, after "a few days" at most;

b.  To the extent they never had the authority to honor that representation, encouraging

10

Mr. Beschauer to put himself at substantial risk of physical injury through reporting known inmate/correctional officer misconduct by use of a knowingly false representation that they had the authority take action they knew was necessary to ameliorate the risk created by their own actions (i.e., relocate Mr. Beschauer);

c. Failing to take any meaningful action to protect Mr. Beschauer from being assaulted despite multiple communications from him expressly requesting to be relocated because he was being threatened by offenders in his housing unit and had been "outted" as the individual who had reported various correctional officers' complicity in unauthorized inmate activity (such as having Mr. Beschauer relocated or having him monitored by correctional staff until a housing relocation occurred); and

d. Failing to take any meaningful action to protect Mr. Beschauer from being assaulted despite being notified by email of the imminent danger to Mr. Beschauer.

43.    Defendants were obligated under the Eighth Amendment to take reasonable measures to abate the known risk of physical harm to Mr. Beschauer.  It was foreseeable at all times to Defendants that their inaction in the face of a known, escalating threat to Mr. Beschauer's physical safety would result in him being brutally assaulted by another inmate in his housing unit.  Yet, Defendants  chose the path of complete inaction and, in so doing, violated Mr. Beschauer's rights under the Eighth Amendment.

44.    It was at all times foreseeable to Defendants that the tortious conduct set forth in this Count would result in Mr. Beschauer being violently assaulted by other offenders in his housing unit and that he would suffer severe physical harm (even possibly to the point of death) in connection with such an assault.  The tortious conduct set forth in this Count caused Mr. Beschauer to be assaulted in that: (a) Defendants procured his participation in monitoring and

11

reporting inmate/correctional officer misconduct based on their knowingly false promise (i.e., that he would be moved to a new housing unit should he observe aggressive behavior from other offenders in his housing unit and, in any event, after "a few days" at most) and, but for that false promise, Mr. Beschauer would not have engaged in the informant activities that precipitated him being assaulted; and (b) Defendants prevented Mr. Beschauer from relocating to a safe housing unit and receiving the benefit of other security measures (such as heightened monitoring or relocation to temporary housing).

45.     Defendants engaged in the tortious conduct set forth in this Count while acting under the authority of their official positions with VDOC and by virtue of the authority conferred upon them by VDOC and under color of state law.

46.     As a direct and proximate result of the tortious conduct described in this Count, Mr. Beschauer was brutally assaulted and suffered severe, extensive physical and mental injury, including (but not limited to):

    a.  Fractured facial bones and extensive damages to facial soft tissue;

    b.  Generalized head trauma;

    c.  Various contusions and abrasions;

    d.  Bruised and/or fractured ribs; and

    e.  Continuing sequelae of injuries sustained during the assault to include ongoing neurological and psychological trauma, loss of hearing, and other injuries to be established by treatment records and expert testimony.

47.     Thus, as a result of the tortious conduct set forth in this Count, Mr. Beschauer was injured and suffered the following damages: severe physical pain and mental anguish, past, present, and that which he may be reasonably expected to suffer in the future; disfigurement,

12

deformity, associated humiliation and embarrassment, shame, fright, humiliation, mortification, past, present, and that which he may reasonably be expected to incur in the future; past medical expenses and those which he may be reasonably expected to suffer in the future; and lost earning capacity which he may be reasonably expected to suffer in the future.

48.     Moreover, Defendants' tortious conduct as set forth above was so reckless, willful, and wanton that it warrants an assessment of punitive damages against them.

**Count II – Simple Negligence**
**(All Defendants)**

49.     Mr. Beschauer incorporates the prior allegations of this pleading as if fully stated within this Count.

50.     At all times after Mr. Beschauer first reported the unauthorized conduct occurring in his housing unit to Ms. Adams and Lt. Davis (and particularly after each instance he sent written correspondence to Defendants exactly as instructed that requested a housing change due to him developing enemies in his housing unit due to his provision of intelligence to Ms. Adams and Lt. Davis), Ms. Adams and Lt. Davis were required under VDOC policy to inform their OIC and other members of the chain of command of the risk of harm Mr. Beschauer faced by virtue of Defendants enlisting him to provide intelligence on offender/correctional officer misconduct as well as his multiple requests for relocation.  This reporting obligation was non-discretionary in nature and a routine duty associated with their positions.

51.     Defendants owed Mr. Beschauer a duty of reasonable care given the custodial relationship between them.  To the extent they did not owe Mr. Beschauer a duty of care under existing law, they assumed such a duty through their affirmative representations that he would be moved to a new housing unit should he observe aggressive behavior from other offenders in his housing unit and, in any event, after "a few days" at most.  By voluntarily undertaking to change

13

to Mr. Beschauer's housing assignment in exchange for his cooperation in providing the requested intelligence, Ms. Adams and Lt. Davis became obligated under the law to perform their voluntary undertaking with reasonable care.

52.     The duty of care Defendants owed Mr. Beschauer required that they inform their OIC and other members of the chain of command of the risk of harm Mr. Beschauer was facing by virtue of Defendants enlisting him to provide intelligence on offender/correctional officer misconduct, as well as Mr. Beschauer's multiple requests for relocation so his housing situation could be adjusted as needed to ensure his physical safety.  Defendants breached this duty of care by failing to disseminate these routine, non-discretionary, and ministerial reports to their chain of command.  Upon information and belief, had Defendants not breached their duty of care in this regard, Mr. Beschauer would not have been assaulted because his housing situation would have been changed and/or additional security procedures would have been put in place (such as heightened monitoring of Mr. Beschauer by correctional officers) until the housing change occurred.

53.     As part of agreeing to provide Ms. Adams and Lt. Davis the requested intelligence (initially and through subsequent written reports), Mr. Beschauer relied on their representation that he would be relocated if needed to protect his safety and, in any event, after "a few days" at most.  By enlisting Mr. Beschauer to provide intelligence as to offender/correctional officer misconduct and then not taking measures necessary to timely relocate Mr. Beschauer, Ms. Adams and Lt. Davis affirmatively increased the likelihood that Mr. Beschauer would be the victim of a violent assault by other offenders and suffer severe bodily injury (even possibly to the point of death).

54.     It was at all times foreseeable to Defendants that the tortious conduct set forth in

14

this Count would result in Mr. Beschauer being violently assaulted by other offenders in his housing unit and that he would suffer severe physical harm (even possibly to the point of death) in connection with such an assault.

55.     The tortious conduct set forth in this Count caused Mr. Beschauer to be assaulted in that: (a) Defendants procured his participation in monitoring and reporting inmate/correctional officer misconduct based on their knowingly false promise (i.e., that he would be moved to a new housing unit if needed to protect his safety and, in any event, after "a few days" at most) and, but for that false promise, Mr. Beschauer would not have agreed to becoming an informant (i.e., engaging in the activity that precipitated him being assaulted); and (b) Defendants prevented Mr. Beschauer from relocating to a safe housing unit and receiving the benefit of other security measures (such as heightened monitoring or relocation to temporary housing).

56.     As a direct and proximate result of the tortious conduct described in this Count, Mr. Beschauer was brutally assaulted and suffered severe, extensive physical and mental injury, including (but not limited to):

    a.   Fractured facial bones and extensive damages to facial soft tissue;

    b.   Generalized head trauma;

    c.   Various contusions and abrasions;

    d.   Bruised and/or fractured ribs; and

    e.   Continuing sequelae of injuries sustained during the assault to include ongoing neurological and psychological trauma, loss of hearing, and other injuries to be established by treatment records and expert testimony.

57.     Thus, as a result of the tortious conduct set forth in this Count, Mr. Beschauer was injured and suffered the following damages: severe physical pain and mental anguish, past,

15

present, and that which he may be reasonably expected to suffer in the future; disfigurement, deformity, associated humiliation and embarrassment, shame, fright, humiliation, mortification, past, present, and that which he may reasonably be expected to incur in the future; past medical expenses and those which he may be reasonably expected to suffer in the future; and lost earning capacity which he may be reasonably expected to suffer in the future.

## Count III – Gross Negligence
### (All Defendants)

58. Mr. Beschauer incorporates the prior allegations of this pleading as if fully stated within this Count.

59. At all times spanning February 1, 2016 – March 10, 2016, Defendants owed Mr. Beschauer a duty of reasonable care given the custodial relationship between them. To the extent they did not owe Mr. Beschauer a duty of care under existing law, they assumed such a duty through their affirmative representations that he would be moved to a new housing unit should he observe aggressive behavior from other offenders in his housing unit and, in any event, after "a few days" at most. By voluntarily undertaking to change Mr. Beschauer's housing assignment in exchange for his cooperation in providing the requested intelligence, Ms. Adams and Lt. Davis became obligated under the law to perform their voluntary undertaking with reasonable care.

60. The duty of care Ms. Adams and Lt. Davis owed Mr. Beschauer required they inform their OIC and other members of the chain of command of the risk of harm Mr. Beschauer faced by virtue of Defendants enlisting him to provide intelligence on offender/correctional officer misconduct as well as Mr. Beschauer's multiple requests for relocation due to observed aggression from other offenders in his housing unit. The duty of care Ms. Adams and Lt. Davis owed Mr. Beschauer required that they take whatever steps were necessary to change Mr.

16

Beschauer's housing assignment as promised (i.e., that he would be moved to a new housing unit should he observe aggressive behavior from other offenders in his housing unit and, in any event, after "a few days" at most). Moreover, the duty of care required Ms. Adams and Lt. Davis to refrain from enticing Mr. Beschauer to place himself at substantial risk of severe physical harm by enlisting him to provide intelligence (initially and in an ongoing fashion) regarding inmate/correctional officer misconduct while simultaneously lacking the authority and/or willingness to make good on their promise to change his housing assignment (and being fully aware that the change in housing was necessary to ameliorate the risk of harm created by their enlistment of Mr. Beschauer).

61.    As part of agreeing to provide Ms. Adams and Lt. Davis the requested intelligence (initially and through subsequent written reports) Mr. Beschauer relied on Defendants' representation that he would be relocated if needed to protect his safety and, in any event, after "a few days" at most. By enlisting Mr. Beschauer to provide intelligence as to offender/correctional officer misconduct and then not taking measures necessary to timely relocate Mr. Beschauer, Ms. Adams and Lt. Davis affirmatively increased the likelihood that Mr. Beschauer would be the victim of a violent assault by other offenders and suffer severe bodily injury (even possibly to the point of death).

62.    Notwithstanding their awareness that their inaction in relocating Mr. Beschauer would almost certainly lead to him being violently assaulted and severely injured, Defendants breached the duty of care owed to Mr. Beschauer by:

  a. Failing to inform their chain of command of known threats to Mr. Beschauer's safety and Mr. Beschauer's multiple requests for housing changes and reports of escalating aggression within his housing unit;

17

b. Failing to take whatever steps were necessary to change Mr. Beschauer's housing assignment as promised (i.e., within a "few days" after their initial meeting with Mr. Beschauer);

c. Failing to take additional precautions in the absence of effecting a permanent housing change (such as additional monitoring by correctional officers or a temporary housing change to allow time to assess the level of risk presented by the circumstances);

d. Enticing Mr. Beschauer to place himself at substantial risk of severe physical harm by asking him to provide ongoing intelligence of inmate/correctional officer misconduct while simultaneously lacking the authority and/or willingness to make good on their promise to change his housing assignment (while also knowing the change in housing was necessary to ameliorate the risk of harm Defendants affirmatively created through their enlistment of Mr. Beschauer); and

e. Failing to take any meaningful action to protect Mr. Beschauer from being assaulted despite being notified by email of the imminent danger to Mr. Beschauer.

63. Indeed, Defendants not only breached the duty of care owed to Mr. Beschauer, they took no meaningful action to address or mitigate the risk of harm faced by Mr. Beschauer that they themselves had affirmatively created. They ignored Mr. Beschauer's repeated pleas for assistance as well as their prior promise to have him relocated. Their conduct reflects complete indifference and want of care with regard to Mr. Beschauer's safety (in the face of a known and escalating threat of physical injury) and utter disregard of prudence in performing their duties. Upon information and belief, had Ms. Adams and Lt. Davis not breached their duty of care as set forth above, Mr. Beschauer would not have been assaulted because his housing assignment would have been changed and/or additional security procedures would have been put in place

18

(such as heightened monitoring of Mr. Beschauer by correctional officers) until the housing change occurred.

64.     It was at all times foreseeable to Defendants that the tortious conduct set forth in this Count would result in Mr. Beschauer being violently assaulted by other offenders in his housing unit and that he would suffer severe physical harm (even possibly to the point of death) in connection with such an assault.

65.     The tortious conduct set forth in this Count caused Mr. Beschauer to be assaulted in that: (a) Defendants procured his participation in monitoring and reporting inmate/correctional officer misconduct based on their knowingly false promise (i.e., that he would be moved to a new housing unit if needed to protect his safety and, in any event, after "a few days" at most) and, but for that false promise, Mr. Beschauer would not have agreed to becoming an informant (i.e., engaging in the activity that precipitated him being assaulted); and (b) Defendants prevented Mr. Beschauer from relocating to a safe housing unit and receiving the benefit of other security measures (such as heightened monitoring or relocation to temporary housing).

66.     As a direct and proximate result of the tortious conduct described in this Count, Mr. Beschauer was brutally assaulted and suffered severe, extensive physical and mental injury, including (but not limited to):

a.  Fractured facial bones and extensive damages to facial soft tissue;

b.  Generalized head trauma;

c.  Various contusions and abrasions;

d.  Bruised and/or fractured ribs; and

e.  Continuing sequelae of injuries sustained during the assault to include ongoing neurological and psychological trauma, loss of hearing, and other injuries to be

19

established by treatment records and expert testimony.

67.     Thus, as a result of the tortious conduct set forth in this Count, Mr. Beschauer was injured and suffered the following damages: severe physical pain and mental anguish, past, present, and that which he may be reasonably expected to suffer in the future; disfigurement, deformity, associated humiliation and embarrassment, shame, fright, humiliation, mortification, past, present, and that which he may reasonably be expected to suffer in the future; past medical expenses and those which he may be reasonably expected to incur in the future; and lost earning capacity which he may be reasonably expected to suffer in the future.

Accordingly, based upon the foregoing, Plaintiff demands judgment against all Defendants, jointly and severally, in an amount in excess of ONE MILLION DOLLARS ($1,000,000.00) for compensatory damages, and ONE MILLION DOLLARS ($1,000,000.00) in punitive damages under federal law, together with costs incurred in the pursuit of just resolution of this matter, pre-judgment and post-judgment interest and attorney's fees and costs as permitted by 42 U.S.C. § 1988.

**A JURY TRIAL IS REQUESTED.**

DATE: March 8, 2018                              RESPECTFULLY SUBMITTED,


DAVID BESCHAUER


By: _____
                        Counsel


Jonathan E. Halperin (VSB No. 32698)
Isaac A. McBeth (VSB No. 82400)
Counsel for Plaintiff
Halperin Law Center, LLC
5225 Hickory Park Drive, Suite B
Glen Allen, VA 23059
(804) 527-0100
(866) 335-1502 facsimile
jonathan@halperinlegal.com
isaac@halperinlegal.com

21